SEALED

ORDERED UNSEALED on 09/11/2026 s/ melindajw

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>MOHAMAD SALIM ALAWAD,<br>Defendant. | Case No.: 26mj5190<br>**COMPLAINT FOR VIOLATION OF**<br>Title 18, U.S.C., Sec. 1343 – Wire Fraud; Title 18, U.S.C., Sec. 1957 Money Laundering; Title 18, U.S.C., Secs. 981(a)(1)(A), (C), 982(a)(1), (2) and Title 28, U.S.C., Sec. 2461(c) and Title 21, U.S.C., Sec. 853 - Criminal Forfeiture<br>**[UNDER SEAL]** |

The undersigned complainant being duly sworn states:

At all times relevant to this Complaint:

**INTRODUCTION**

1. The United States Department of Health and Human Services ("HHS") provided federal funding to states, including the State of California, to help low-income families pay for childcare expenses.

2. In California, four programs provided subsidies to childcare providers servicing income-eligible families: CalWORKs Stage 1, CalWORKs Stage 2 Alternative Payment ("C2AP"), CalWORKs Stage 3 Alternative Payment ("C3AP"), and California Alternative Payment Program ("CAPP").

3. In the Southern District of California, the County of San Diego administered "Stage 1" subsidies, and two community organizations,

Child Development Associates ("CDA") and the Young Men's Christian Association ("YMCA"), administered subsidies through the C2AP, C3AP, and CAPP.

4. Generally, if CDA or YMCA determined that a family was eligible to receive subsidized childcare services and the family's selected childcare provider (i) registered with CDA or YMCA, (ii) had an active license to provide care at an approved facility from the State of California Department of Social Services ("CDSS"), and (iii) submitted monthly attendance records documenting the childcare they provided, CDA and YMCA paid subsidies directly to the childcare provider, via check or direct deposit, for providing childcare to registered income-eligible families.

5. Monthly attendance record forms had "self-certification" and signature sections for both the childcare provider and the parent, both of which began, "I declare under penalty of perjury that the information provided on this attendance record is true and correct[.]" Without a completed and signed attendance record, CDA and YMCA did not issue payment to registered childcare providers.

6. CDA and YMCA used a third-party software company to transmit blank monthly attendance records forms to childcare providers. The attendance record forms included the childcare provider's name, the child's name, the parent's name, and a table for entering the child's "Time In" and "Time Out" on each day of the month.

7. Childcare providers could submit completed attendance record forms to CDA and YMCA in-person, via mail, or through a software application. All submissions resulted in a copy of the completed attendance record being transmitted, over interstate wire communications, to the third-party software company's servers in Oregon.

8. California regulations stated in part, "The licensee shall be present in the home and shall ensure that children in care are supervised at all times. When circumstances require the licensee to be temporarily absent from the home, the licensee shall arrange for a substitute adult to care for and supervise the children during his/her absence. Temporary absences shall not exceed 20 percent of the hours that the facility is providing care per day." Cal. Code Regs. Tit. 22, § 102417(a).

9. Defendant MOHAMAD SALIM ALAWAD, a resident of the Southern District of California, operated "Alawad, Mohamad Family Child Care" at an apartment on University Avenue in San Diego, within the Southern District of California. The license, effective December 20, 2019, authorized ALAWAD to provide care for up to eight children at the facility on University Avenue.

10. Following an application for a "location change" defendant ALAWAD received a license from CDSS to operate "Alawad, Mohamad Family Child Care" at an apartment on Highland Avenue in San Diego, California, within the Southern District of California. The license, effective April 22, 2020, authorized ALAWAD to provide care for up to eight children at the facility on Highland Avenue.

11. Following an application for a "location change" and "capacity change," Defendant ALAWAD received a license from CDSS to operate "Alawad, Mohamad Family Child Care" at an address on 47th Street in San Diego, California, within the Southern District of California. The license, effective March 9, 2022, authorized ALAWAD to provide care for up to 14 children at the facility on 47th Street.

///

///

///

**<u>Counts 1-4</u>**

**(Wire Fraud)**

**[18 U.S.C. § 1343]**

12. Paragraphs 1 to 11 are re-alleged and incorporated herein.

13. Beginning on a date unknown, but no later than in or about December 2019, and continuing through at least July 1, 2026, within the Southern District of California and elsewhere, defendant MOHAMAD SALIM ALAWAD, knowingly and with the intent to defraud, devised, participated in, and executed a material scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and intentional concealment and omission of material facts.

**Manner and Means**

14. The fraudulent scheme and artifice to defraud was operated and was carried out, and to be carried out, in substance, as follows:

15. Defendant ALAWAD applied for and received from CDSS licenses to operate childcare facilities in the Southern District of California.

16. After obtaining licenses from CDSS, defendant ALAWAD registered with CDA and YMCA as the childcare provider for families that received subsidized childcare services.

17. Defendant ALAWAD, using the third-party software, accessed and printed blank monthly attendance records for each child ALAWAD was registered with CDA or YMCA as the childcare provider.

18. Defendant ALAWAD submitted to CDA and YMCA completed attendance records for each child ALAWAD had purportedly provided childcare to in the preceding month, and certified under penalty of perjury the accuracy of the dates and times he provided care to a child.

///

19. Defendant ALAWAD, to obtain payment from CDA and YMCA, knowingly submitted and caused to be submitted attendance records containing materially false and fraudulent statements, specifically the dates and times he purportedly provided childcare to the children identified in the attendance records, and his false certification under penalty of perjury that that the information in the attendance records was true and correct.

20. Defendant ALAWAD submitted his attendance records to CDA and YMCA, both of which processed the records through the same third-party software and thereby caused interstate wire communications, specifically the transmittal of the attendance records to the third-party software company's server in Oregon.

21. CDA and YMCA relied on defendant ALAWAD's false and fraudulent statements in the attendance records and remitted payment to ALAWAD based on his materially false and fraudulent representations, promises, and intentional concealment and omission of material facts. In doing so, ALAWAD obtained funds from the United States Government that were intended to pay for childcare actually provided to low-income families.

**Use of the Wires**

22. On or about the dates set forth below, within the Southern District of California and elsewhere, defendant MOHAMAD SALIM ALAWAD, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, knowingly transmitted and caused to be transmitted by wire communications in interstate and foreign commerce, certain writings, signs, signals, and sounds as more particularly described below:

///

///

| Count | Approximate Date | Interstate Wire |
|---|---|---|
| **1** | April 2, 2026 | Electronic submission of March 2026 Attendance Record for Child 1 |
| **2** | April 2, 2026 | Electronic submission of March 2026 Attendance Record for Child 2 |
| **3** | May 4, 2026 | Electronic submission of April 2026 Attendance Record for Child 1 |
| **4** | May 4, 2026 | Electronic submission of April 2026 Attendance Record for Child 2 |

All in violation of Title 18, United States Code, Section 1343.

**Count 5**

**(Money Laundering)**

**[18 U.S.C. § 1957]**

23. Paragraphs 1 to 22 are re-alleged and incorporated herein.

24. On or about April 9, 2026, within the Southern District of California, defendant MOHAMAD SALIM ALAWAD did knowingly engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000.00, and which was derived from specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, to wit: the withdrawal of $36,500 from Wells Fargo account -4937, all in violation of Title 18, United States Code, Section 1957.

**FORFEITURE ALLEGATIONS**

The allegations set forth in Counts 1 through 5 of this Complaint are realleged and incorporated as a part hereof for purposes of seeking forfeiture of property pursuant to Title 18, United States Code, Sections 981(a)(1)(A)&(C), 982(a)(1), and 982(b), and Title 28, United States Code, Section 2461(c).

Upon conviction of one and more of the offenses in violation of Title 18, United States Code, Section 1343 set forth in Counts 1 through 4 of this Complaint, defendant MOHAMAD SALIM ALAWAD shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(A), and Title 28, United States Code, Section 2461(c) and Title 21, United States Code, Section 853, all property, real and personal, which constitutes or is derived from proceeds of the offenses and all property traceable to such property, and all facilitating property.

Upon conviction of the offense in violation of Title 18, United States Code, Section 1957 as set forth in Count 5 defendant MOHAMAD SALIM ALAWAD shall forfeit to the United States all property involved in the offense pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 982(a)(1).

If any of the forfeitable property, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the Defendant up to the value of the forfeitable property.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(B), and Title 28, United States Code, Section 2461(c).

The complainant states that this complaint is based on the attached probable cause statement, which is incorporated herein by reference.

JOSHUA ADAMS, Special Agent
IRS-Criminal Investigation

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 3rd day of September 2026.

HON. DAVID D. LESHNER
United States Magistrate Judge

STATEMENT OF PROBABLE CAUSE

**A. Training and Experience**

1. I am a Special Agent of the Internal Revenue Service-Criminal investigation (IRS-CI) and have been employed since October 2023. I am currently assigned to the Los Angeles Field Office, but I work out of the San Diego, California office. I have a Bachelor of Science degree in Homeland Security and Emergency Management from National University. As part of my employed with IRS-CI, I received extensive training at the Federal Law Enforcement Training Center in Glynco, Georgia. While the training included wide-ranging instruction relating to criminal tax violations, I also received training on other federal criminal violations such as mail fraud, wire fraud, money laundering, bribery, conspiracy, and a number of other offenses which constitute specified unlawful activities under federal law.

2. All dates, times, and amounts herein are approximate.

**B. Background of Federally Subsidized Childcare Programs**

3. The United States Department of Health & Human Services provides federal funding to states to help low-income families pay for childcare expenses.

4. In California, there are four programs that provide subsidies to childcare providers servicing income-eligible families: CalWORKs Stage 1, CalWORKs Stage 2 Alternative Payment ("C2AP"), CalWORKs Stage 3 Alternative Payment ("C3AP"), and California Alternative Payment Program ("CAPP"). In San Diego, the County of San Diego administers "Stage 1" subsidies, and two community organizations, Child Development Associates ("CDA") and the Young Men's Christian Association ("YMCA"), administer subsidies through the C2AP, C3AP, and CAPP.

///

5. Generally, if CDA or YMCA determines that a family is eligible to receive subsidized childcare services and their selected childcare provider registers with CDA or YMCA, has an active license to provide care at an approved facility from the State of California Department of Social Services ("CDSS"), and submits monthly attendance records documenting the childcare they provided, CDA and YMCA pay subsidies directly to the childcare provider, via check or direct deposit, for providing childcare to registered income-eligible families.

6. The monthly attendance record forms have "self-certification" and signature sections for both the childcare provider and the parent, both of which begin "I declare under penalty of perjury that the information provided on this attendance record is true and correct[.]" Without a completed and signed attendance record, CDA and YMCA do not issue payment to registered childcare providers.

7. CDA and YMCA both use a third-party software company to transmit blank monthly attendance records forms to childcare providers. The attendance record forms include the childcare provider's name, the child's name, the parent's name, and a table for entering the child's "Time In" and "Time Out" on each day of the month. A childcare provider can submit completed attendance record forms to CDA and YMCA in-person, via mail, or through a software application; all submissions result in a copy of the completed attendance record being transmitted to the third-party software company's servers in Oregon.

8. California regulations state in part: "The licensee shall be present in the home and shall ensure that children in care are supervised at all times. When circumstances require the licensee to be temporarily absent from the home, the licensee shall arrange for a substitute adult to care for and supervise the children during his/her absence. Temporary

absences shall not exceed 20 percent of the hours that the facility is providing care per day." Cal. Code Regs. Tit. 22, § 102417(a).

**C. Investigation Background**

9. Since February 2026, IRS-CI and Homeland Security Investigations ("HSI") have been investigating a scheme in which individuals in the Southern District of California receive licenses to operate childcare facilities, register as childcare providers to families approved for subsidized childcare, and routinely submit materially false and fraudulent monthly attendance records to obtain subsidy payments. The attendance records are false and fraudulent in that they claim the individual provided care to children on dates and times that no actual childcare could have been provided, either because there were no children at the facility or the licensed provider was not at the facility--and in some instances was not even in the United States at the time of the purported childcare. CDA and YMCA rely on the accuracy of the attendance records when remitting payment to providers for the childcare they purportedly provided to low-income families.

10. Through the investigation, agents identified Defendant MOHAMAD SALIM ALAWAD as an individual who purported to provide childcare services in San Diego, California, which is in the Southern District of California, since at least 2019.

11. ALAWAD first received a license from CDSS to operate "Alawad, Mohamad Family Child Care" at an apartment on University Avenue in San Diego effective December 20, 2019. The license authorized ALAWAD to provide care to up to eight children at the facility on University Avenue.

12. Defendant ALAWAD submitted to CDSS applications for a "location change" and received a license from CDSS to operate "Alawad,

Mohamad Family Child Care" at an apartment on Highland Avenue in San Diego, California effective May 22, 2020. The license authorized ALAWAD to provide care for up to eight children at the facility on Highland Avenue.

13. Defendant ALAWAD submitted to CDSS applications for a "location change" and "capacity change," and received a license from CDSS to operate "Alawad, Mohamad Family Child Care" at a house on 47th Street in San Diego effective March 9, 2022. The license authorized ALAWAD to provide care for up to 14 children at the facility on 47th Street.

14. On six occasions between December 2019 and July 2025, ALAWAD signed forms submitted to CDA acknowledging in part "I understand when I sign anything under penalty of perjury I am declaring the information I have provided or statements I am making are factual, true and correct. Making false statements under penalty of perjury may result in prosecution and punishment under State and/or Federal laws."

15. Since January 2020, ALAWAD has received over $1,200,000 in payments from San Diego County, YMCA and CDA, including over $350,000 in 2025 alone. Between January 2026 and June 2026, ALAWAD has received an average of $29,160.71 per month from CDA.

**D. ALAWAD Falsely Certified Attendance Records**

16. Based on my investigation, I believe ALAWAD falsely certified attendance records for March 2026 and April 2026.

17. On or about April 1, 2026, ALAWAD submitted 25 attendance records to CDA, and claimed under penalty of perjury to have provided childcare to 25 children in March 2026. ALAWAD claimed in the attendance records that he provided childcare every day of March 2026. Notably, ALAWAD's attendance records claimed that he cared for at least 12

children, including a four-month-old baby every weekend day of March 2026, with care purportedly provided every from approximately 1:00 p.m. to 10:30 p.m. ALAWAD also claimed to have provided care to at least 12 children, including a one-year-old baby and a two-year-old child every weekday, with care provided from approximately 8:30 a.m. to 10:30 p.m.

18. On or about May 1, 2026, ALAWAD submitted 25 attendance records to CDA, and claimed under penalty of perjury to have provided childcare to 25 children in April 2026. ALAWAD similarly claimed in the attendance records to have provided childcare every day of April 2026. Notably, ALAWAD's attendance records claimed that he cared for at least 12 children, including a four-month-old baby, every weekend day of April 2026. ALAWAD also claimed to have provided care to at least 12 children every weekday of April 2026, with care purportedly provided from approximately 8:30 a.m. to 10:30 p.m.

19. Each of the attendance records ALAWAD submitted for the months of March and April 2026 listed "Mohamad Salim Alawad" (ALAWAD) as the provider and contained a dated signature under the "Provider Self-Certification" stating in part, "I declare under penalty of perjury that the information provided on this attendance record is true and correct[.]" The only active childcare license ALAWAD had during March and April 2026 was for "Alawad, Mohamad Family Child Care" on 47th Street in San Diego.

20. ALAWAD submitted the attendance records for March and April 2026 to CDA and YMCA in the Southern District of California, and he caused the following interstate wires when the attendance records were transmitted to the third-party software company's server in Oregon:

///

///

| Approximate Date | Interstate Wire |
|---|---|
| April 2, 2026 | Electronic submission of March 2026 Attendance Record for Child 1 |
| April 2, 2026 | Electronic submission of March 2026 Attendance Record for Child 2 |
| May 4, 2026 | Electronic submission of April 2026 Attendance Record for Child 1 |
| May 4, 2026 | Electronic submission of April 2026 Attendance Record for Child 2 |

**E. Surveillance of ALAWAD's Facility**

21. A member of the investigation team conducted surveillance of ALAWAD's facility on 47th Street on February 26, 2026, from approximately 3:15 p.m. to 5:02 p.m., and did not observe any children entering or exiting the facility during that time.

22. On or about March 2, 2026, ALAWAD submitted 13 attendance records that claimed he provided care to 13 children on February 26, 2026, with his care of each of the 13 children purportedly beginning between 3:18 p.m. and 3:45 p.m. Because no children were observed during the surveillance on February 26, I believe the 13 attendance records ALAWAD submitted were materially false, fraudulent, and fabricated to obtain payment for childcare that ALAWAD did not actually provide in February 2026.

**F. Stationary Remote Surveillance of ALAWAD's Facility**

23. The investigation team began stationary remote surveillance of ALAWAD's licensed facility on 47th Street on March 20, 2026, and ended the surveillance on April 27, 2026. Of the 39 days captured in

///

///

///

the surveillance recordings, children are shown entering or exiting ALAWAD's facility on 16 days.[1]

24. The table below identifies the number of children ALAWAD claimed to provide care to in the attendance records and the number of children observed entering or exiting the facility in the electronic surveillance recordings:

| **Date [2026]** | **Children ALAWAD Claimed on Attendance Records** | **Children Observed at ALAWAD's Facility in Surveillance Recordings** |
|---|---|---|
| March 21 | 13 | 0 |
| March 22 | 13 | 2 |
| March 23 | 12 | 0 |
| March 24 | 12 | 0 |
| March 25 | 12 | 2 |
| March 26 | 12 | 0 |
| March 27 | 12 | 2 |
| March 28 | 13 | 0 |
| March 29 | 13 | 1 |
| March 30 | 12 | 3 |
| March 31 | 12 | 0 |
| April 1 | 12 | 0 |
| April 2 | 12 | 4 |
| April 3 | 12 | 2 |
| April 4 | 12 | 1 |
| April 5 | 12 | 3 |
| April 6 | 12 | 2 |
| April 7 | 12 | 0 |
| April 8 | 12 | 3 |
| April 9 | 12 | 1 |
| April 10 | 12 | 0 |
| April 11 | 12 | 0 |
| April 12 | 12 | 0 |
| April 13 | 12 | 3 |
| April 14 | 12 | 0 |
| April 15 | 12 | 0 |

[1] The surveillance recordings do not include every minute of the 39 days; rather, the stationary remote surveillance recorded only for a duration after detecting motion in the frame, including people or moving vehicles on the sidewalk, street, or driveway adjacent to the facility.

| Date [2026] | Children ALAWAD Claimed on Attendance Records | Children Observed at ALAWAD's Facility in Surveillance Recordings |
|---|---|---|
| April 16 | 12 | 0 |
| April 17 | 12 | 0 |
| April 18 | 12 | 3 |
| April 19 | 12 | 0 |
| April 20 | 12 | 0 |
| April 21 | 12 | 0 |
| April 22 | 12 | 2 |
| April 23 | 12 | 0 |
| April 24 | 12 | 6 |
| April 25 | 12 | 0 |
| April 26 | 12 | 0 |
| April 27 | 11 | 0 |

25. Despite ALAWAD's attendance records claiming he provided childcare to at least 12 children every day of March 2026, the surveillance recordings did not show any children entering or exiting the facility on at least 6 of the 11 days between March 21 and March 31, 2026. On the 5 days that children were observed in the surveillance recordings, no more than 3 children were observed entering or exiting the facility.

26. Similarly, despite ALAWAD's attendance records claiming he provided childcare every day of April 2026, the surveillance recordings did not show any children entering or exiting the facility on 16 of the 27 days between April 1 and April 27, 2026. As to the 11 days when children were observed entering or exiting the facility, on there were no more than three children observed on 10 days, and 6 children observed on one day.

**G. CDSS Visits to ALAWAD'S Facility**

27. During my investigation, I discovered that certain CDSS reports are available through open-source research. According to

publicly available reports, a CDSS licensing program analyst conducted an unannounced visit to ALAWAD's facility on 47th Street on six occasions between March 2022 and February 2026. According to the reports summarizing these visits, ALAWAD was present at the facility and there were no children present during all but one of the visits. Below is a summary of three of the CDSS inspections of ALAWAD's facility.

**CDSS Visit on February 6, 2023**

28. According to the CDSS facility evaluation report summarizing the unannounced visit on February 6, 2023, the CDSS analyst arrived at 9:23 a.m., met with ALAWAD, and completed the inspection at 11:30 a.m.; "[o]nly the licensee [ALAWAD] was present in the facility during this inspection."

29. On or about March 2, 2023, ALAWAD subsequently submitted attendance records claiming to have provided childcare to at least eight different children on February 6, 2023. Specifically, ALAWAD claimed to have provided care to five children from approximately 4:30 p.m. to 9:40 p.m., and to three additional children from 4:30 p.m. to 8:45 p.m. In other words, ALAWAD did not claim in the attendance records to have provided childcare during the CDSS inspection on February 6, 2023, in which no children were present according the facility evaluation report.

**CDSS Visit on August 14, 2024**

30. According to the CDSS facility evaluation report summarizing the unannounced visit on August 14, 2024, the CDSS analyst arrived at 2:15 p.m., ALAWAD and "six (6) daycare children, ages 1 year, 2 years, 6 years, 8 years, 9 years and 11 years" were present in the facility, and the inspection was completed at 2:45 p.m.

31. On or about September 1, 2024, ALAWAD subsequently submitted attendance records claiming to have provided childcare to at least seven

different children on August 14, 2024. Specifically, ALAWAD claimed to have provided care to four children from approximately 4:00 p.m. to 10:00 p.m.; and three additional children from 3:03 p.m. to 9:32 p.m. Assuming the accuracy of the times and the number of children in the CDSS facility evaluation report, it appears ALAWAD at a minimum misstated the "Time In" for the children present during the inspection on August 14, 2024, between 2:15 p.m. and 2:45 p.m.

**CDSS Visit on February 26, 2026**

32. According to the CDSS facility evaluation report summarizing the unannounced visit on February 26, 2026, the CDSS analyst arrived at 8:25 a.m., met with ALAWAD and two other adults, and completed the inspection at 12:15 p.m.; "[t]here were no day-care children present at the time of the inspection," and ALAWAD stated (through a translator) that children start arriving around 2:00 p.m.

33. As noted above, a member of the investigation team conducted surveillance on ALAWAD's facility on February 26, 2026, from approximately 3:15 p.m. to 5:02 p.m., and did not observe any children entering or exiting ALAWAD's facility during that time.

34. On or about March 1, 2026, ALAWAD submitted 13 attendance records that claimed he provided childcare to at least 13 children every weekday of February 2026, including February 26, when all 13 children purportedly received care from ALAWAD beginning between 3:18 p.m. and 3:45 p.m. As noted in the preceding paragraph, no children (let alone 13) were observed entering ALAWAD's facility during the surveillance on February 26, which was from approximately 3:15 p.m. to 5:02 p.m.

35. Based on my training and experience and knowledge of this investigation, I believe ALAWAD submitted materially false and

fraudulent attendance records for February 2026 that were fabricated to obtain payment for childcare that ALAWAD did not actually provide.

**G. Payments to ALAWAD**

36. After submitting the attendance records for childcare provided in March 2026, including for Child 1 and Child 2, Defendant ALAWAD received a direct deposit from CDA of $30,587.58 into a bank account April 9, 2026.

37. After submitting the attendance records for childcare purportedly provided in April 2026, including for Child 1 and Child 2, Defendant ALAWAD received two direct deposits from CDA that totaled $27,082.45.

**H. ALAWAD'S International Travel**

38. Border crossing records show ALAWAD departed the United States on or about January 12, 2024, and returned to the United States on February 7, 2024. Despite not being in the United States, ALAWAD submitted at least 21 attendance records to CDA claiming to have provided care to children (for over 6 hours per day) on every day between January 12 to January 31, 2024.

39. Border crossing records show ALAWAD departed the United States on or about June 26, 2024, and returned to the United States on July 30, 2024. Despite not being in the United States, ALAWAD submitted at least 23 attendance records to CDA claiming to have provided care to children (for over 6 hours per day) on every day between July 1 to July 30, 2024.

40. Border crossing records show ALAWAD departed the United States on or about February 6, 2025, and returned to the United States on March 3, 2025. Despite not being in the United States, ALAWAD submitted at least 26 attendance records to CDA claiming to have provided care to

///

children (for over 7 hours per day) on every day between February 6 to February 28, 2025.

41. Border crossing records show ALAWAD departed the United States on or about August 27, 2025, and returned to the United States on September 6, 2025. Despite not being in the United States, ALAWAD submitted at least 26 attendance records to CDA claiming to have provided care to children (for over 7 hours per day) on every day between August 27 to September 6, 2025.

42. Border crossing records show ALAWAD departed the United States on or about April 11, 2026, and returned to the United States on June 1, 2026. Despite not being in the United States, ALAWAD submitted at least 24 attendance records to CDA claiming to have provided care to children (for over 7 hours per day) on every day between April 11 to June 1, 2026.

43. Based on my training and experience and knowledge of this investigation, I believe ALAWAD submitted materially false and fraudulent attendance records for January 2024, July 2024, February 2025, August 2025, September 2025, and April 2026 that were fabricated to obtain payment for childcare that ALAWAD did not actually provide.

**I. ALAWAD's Cash Withdrawal of Proceeds**

44. On April 9, 2026, ALAWAD made a cash withdrawal from Wells Fargo account -4937 of $36,500. ALAWAD is a co-signer on the Wells Fargo account -4937 along with his mother. Although there is a co-signer on the Wells Fargo account, bank records show ALAWAD conducted the monetary transaction.

45. I conducted Lowest Intermediate Balance Rule (LIBR) tracing to determine what amount of the funds used in the withdrawal were attributed to the income that ALAWAD made as part of his daycare scheme.

The income attributed to ALAWAD's daycare scheme is considered "dirty funds," and all ALAWAD's other income is considered "clean funds." Under LIBR, the assumption is that a person spends their clean funds first, and only after the clean funds are exhausted do they begin to spend their dirty funds.

46. After conducting LIBR tracing, ALAWAD's money laundering transactions were identified as follows: ALAWAD's cash withdrawal from Wells Fargo account -4937 of $36,500 on April 9, 2026, was comprised of $20,689.85 of dirty funds and $15,810.15 of potentially clean funds.

**J. Conclusion**

47. Based on my training and experience, I believe ALAWAD executed a wire fraud scheme on a date unknown but no later than December 2019 and continuing through at least July 1, 2026, in violation of 18 U.S.C. § 1343 and knowingly engaged in monetary transactions with criminally derived property of a value greater than $10,000.00 when he withdrew $36,500 from Wells Fargo account ending in -4937.